IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

DANIEL E. ZELL,

      Plaintiff,

    vs.

MICHAEL J. ASTRUE,
Commissioner of
Social Security,

      Defendant.
_____/

No. CIV S-06-0221 JAM GGH

<u>ORDER AND FINDINGS &
RECOMMENDATIONS</u>

      Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"). For the reasons that follow, the court recommends that plaintiff's Motion for Summary Judgment be denied, the Commissioner's Cross Motion for Summary Judgment be granted, and the Clerk be directed to enter judgment for the Commissioner.[1]

---

[1] On January 25, 2008, this court ordered plaintiff to show cause why this case should not be dismissed for lack of prosecution for his failure to file a motion for summary judgment or remand. On April 2, 2008, plaintiff filed a motion for summary judgment. Therefore, the show cause order will be discharged.

1

BACKGROUND

Plaintiff was born on June 1, 1946. Plaintiff claims that he has been continuously disabled since November 19, 1975, due to traumatic brain injury, and that previously awarded benefits (from November 19, 1975 to July 31, 1978) were erroneously or unfairly terminated in 1978. (Tr. at 125-26.)

Plaintiff has a long history of applications for social security and supplemental security income disability benefits. The present case stems from this court's remand in regard plaintiff's fourth application, (and his second application for disability insurance benefits). This DIB application, dated December 12, 1994, alleged an onset date of April 5, 1993, and a date last insured ("DLI") of December 31, 1980.[2] Therefore, plaintiff had to prove disability prior to his DLI. In response to that application, findings and recommendations were issued on February 27, 2002 in case number Civ.S. 00-125 DFL GGH. That remand was ordered by the district court on April 9, 2002 pursuant to the following instructions:

> The Commissioner should make a decision on plaintiff's request to reopen his 1978 cessation of benefits. Even if that decision is made adverse to plaintiff, the Commissioner should review the current disability application (December 12, 1994) after consulting an appropriate specialist(s) who may be able to opine on plaintiff's mental condition during the pertinent time period. Plaintiff should not be precluded by these Findings from producing any further medical evidence that he is able to produce.

Findings and Recommendations, filed February 27, 2002, at 9.

After remand and another hearing, ALJ Franklin D. Holder again found plaintiff not disabled.[3] (Tr. at 125-36.) In a decision dated February 27, 2003, the ALJ made the

---

[2] This court's previous findings and recommendations referred to a DLI of September 30, 1980; however, the ALJ recalculated to the later DLI based on work activity after December 31, 1980. (Civ.S. 00-0125 DFL GGH, Findings and Recommendations, filed February 27, 2002, at 2; Tr. at 126, 134, finding number 2.)

[3] Disability Insurance Benefits are paid to disabled persons who have contributed to the Social Security program, 42 U.S.C. § 401 et seq. Supplemental Security Income is paid to

2

following findings:

  1. The claimant last met the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act on December 31, 1980.

  2. The claimant engaged in work activity since December 31, 1980, but his posted earnings only advanced his date last insured from September 30, 1980 to December 31, 1980.

  3. The claimant alleged additional work activity that should have been covered under FICA wages, but the record does not reflect these additional earnings.

  4. From the period beginning August 1, 1978 through December 31, 1980, the claimant had the following severe impairments: a history of a neurological disorder. However, the claimant's impairments considered alone or in combination do not meet the specific severity criteria of any of the listed impairments in Appendix 1 to Subpart P of Regulations No. 4.

---

disabled persons with low income. 42 U.S.C. § 1382 et seq. Both provisions define disability, in part, as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment. . . ." 42 U.S.C. §§ 423(d)(1)(a) & 1382c(a)(3)(A). A parallel five-step sequential evaluation governs eligibility for benefits under both programs. See 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920 & 416.971-76; Bowen v. Yuckert, 482 U.S. 137, 140-142, 107 S. Ct. 2287 (1987). The following summarizes the sequential evaluation:

  Step one: Is the claimant engaging in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.
  Step two: Does the claimant have a "severe" impairment? If so, proceed to step three. If not, then a finding of not disabled is appropriate.
  Step three: Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1? If so, the claimant is automatically determined disabled. If not, proceed to step four.
  Step four: Is the claimant capable of performing his past work? If so, the claimant is not disabled. If not, proceed to step five.
  Step five: Does the claimant have the residual functional capacity to perform any other work? If so, the claimant is not disabled. If not, the claimant is disabled.

Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).

  The claimant bears the burden of proof in the first four steps of the sequential evaluation process. Bowen, 482 U.S. at 146 n.5, 107 S. Ct. at 2294 n.5. The Commissioner bears the burden if the sequential evaluation process proceeds to step five. Id.

3

5. The claimant's testimony and the documentation submitted did not persuasively establish a basis for reopening the prior denial determination of 1978, and did not persuasively establish debilitating impairments that precluded him from engaging in work activity.

6. The record and the claimant's testimony show that the claimant did, in fact, engage in work activity, much of which was not reported to the Internal Revenue Service and which is not reflected on his earnings record.

7. The claimant's subjective complaints of debilitating impairments prior to his date last insured of December 31, 1980, are not supported by the objective medical evidence and are, therefore, not fully credible.

8. For the period prior to December 31, 1980, the claimant retained the residual functional capacity to perform the physical requirements of medium exertional work activity; i.e., he could sit, stand, or walk for 8 hours a day, and he could lift and carry up to 50 pounds occasionally (20 CFR 404.1567(c)).

9. As of December 31, 1980, the claimant retained the residual functional capacity to perform a full range of medium exertional activities.  His nonexertional impairments stemming from his history of a neurological disorder did not significantly limit his ability to perform sustained work activities.

10. The claimant was unable to perform his past relevant job as a police office [sic] due to his criminal record.

11. As of December 31, 1980, the claimant was 34 years old, considered "a younger individual."

12. As of December 31, 1980, the claimant had a high school education and additional professional training.

13. Considering the claimant's residual functional capacity for medium exertional work activities as of December 31, 1980, together with his age, education, and work experience, Medical-Vocational Rule 203.29 directs a conclusion of "not disabled."

14. Considering the above together with the claimant's nonexertional impairments as of December 31, 1980, the framework of Rule 203.29 supports the conclusion that the claimant was " not disabled."

\\\\\

4

15. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 404.1520(f)).

(Tr. at 134-35.)

ISSUES PRESENTED

Plaintiff has raised the following issues: (A) Whether the ALJ Failed to Develop the Record by not Obtaining Any Independent Retrospective Opinion in Accordance With This Court's Findings and Recommendations; (B) Whether the Commissioner Failed to Show Plaintiff Was Not Disabled; (C) Whether Plaintiff's Benefits Were Terminated for Procedural Reasons and Not on Disability Merits; and (D) Whether the SSA Failed to Produce Records Prior to Plaintiff's Second Head Injury in 1993 Despite This Court's Order of October 6, 2000.[4]

LEGAL STANDARDS

The court reviews the Commissioner's decision to determine whether (1) it is based on proper legal standards pursuant to 42 U.S.C. § 405(g), and (2) substantial evidence in the record as a whole supports it.  Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir.1999). Substantial evidence is more than a mere scintilla, but less than a preponderance.  Saelee v. Chater, 94 F.3d 520, 521 (9th Cir. 1996). "'It means such evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Richardson v. Perales, 402 U.S. 389, 402, 91 S. Ct. 1420 (1971), quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229, 59 S. Ct. 206 (1938). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities."  Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir. 2001) (citations omitted). "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld."  Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002).

---

[4] Plaintiff complains that this court's order of October 6, 2000 required the SSA to produce records; however, the order of that date in case number Civ.S. 00-0125 merely ordered the Commissioner to reconstruct the file. The Commissioner complied with this order. The instant case contained no such order. Therefore, this issue will not be addressed.

ANALYSIS

    A.  Whether the ALJ Properly Considered Plaintiff's Request to Reopen the Prior Decision

        This court's findings and recommendations required the ALJ on remand to consider and decide plaintiff's request to reopen his 1978 cessation of benefits. At that time, the court noted that plaintiff's benefits were terminated in 1978 not because of a medical improvement in plaintiff's condition but because of plaintiff's fear about undergoing a certain type of EEG. Findings and Recommendations, filed February 27, 2002, at 9. Plaintiff did not appeal the decision to terminate his benefits and this court was concerned that he may have lacked the mental capacity to understand his rights of review. The court found that he had made a colorable claim that his due process rights were violated because mental incapacity may have prevented him from requesting timely review of the administrative decision. One of the purposes of the remand was for the ALJ to "determine whether plaintiff in fact lacked such mental capacity." Id. at 6.

        The Commissioner has discretion to reopen an otherwise closed decision. See 20 CFR 988. Although 20 CFR 988 appears to provide a four year time limit for reopening on a showing of good cause, the Commissioner retains discretion to extend the time for review if plaintiff provides evidence that due process was violated because mental incapacity prevented him from requesting timely review of an administrative action. Udd v. Massanari, 245 F.3d 1096, 1099 (9th Cir. 2001); SSR 91-5p. The court's review authority is limited to those situations where the failure to reopen would constitute a violation of due process. Udd at 1099.

        On remand, the ALJ found that the record revealed that plaintiff had a complete understanding of his rights and the actions of the ALJ, Appeals Council and District Court. The ALJ found that there was no support for a finding that plaintiff's benefits were terminated in 1978 due to his fear of undergoing an EEG, and also found that his benefits were not unfairly terminated. Nor was there a basis for the claim of not understanding the effect of his failure to

6

file an appeal.  The ALJ stated that he had reviewed claimant's rights throughout the process and all rights had been respected.  The ALJ had also reviewed the record for plaintiff's mental capacity and found that plaintiff did not lack the mental ability to act on his own behalf regarding his failure to appeal the termination of his benefits.  The ALJ noted that plaintiff was able to act on his own behalf "when he elected not to cooperate with the State Agency's efforts to redetermine the severity of his disability."  Furthermore, the ALJ noted that plaintiff twice waived his right to representation, and his wife had diligently advocated on her husband's behalf.  (Tr. at 132.)

The ALJ also summarized plaintiff's work activity after 1978 and before 1993, which indicated that he earned $5,049.28 in 1983, $2,372 in 1986, $830.70 in 1989, and $2,439.38 in 1992.  (Tr. at 127, 299.)  Although these amounts did not necessarily qualify as substantial gainful activity, they are relevant to plaintiff's mental capacity at the time he should have filed his appeal.  In 1983, he worked as an automobile salesman, and admittedly he had a hard time "keeping up and relied heavily on others for help," according to a letter written by Larry Murphy, president of the car dealership who apparently gave him the job as a favor.  Pl.'s Mot, Ex. 2.  Nevertheless, plaintiff held other jobs during this time period, such as driver for a casino in 1989 and driver for Airborne Overnight Express in 1992 to April, 1993.  (Tr. at 409.)  Plaintiff also reported most recently during psychological testing that he had gotten a plumber's/ contractor's license so that he could upgrade a 200 unit condominium complex.  (Id. at 322.)  According to plaintiff and his wife, they also had a business in the 1980's installing low voltage cable.  He did this type of work from 1986 or 1987 until his 1993 injury.  (Id.)

In addition to these jobs, the ALJ discussed the most recent medical report, completed by Dr. Purisch.  Apparently this exam of plaintiff occurred in October and November, 2001, and the report written on December 13, 2001, about two months before this court's prior findings and recommendations, but after the parties had submitted their summary judgment motions.  The ALJ discussed this psychologist's report in full, and as it pertained to plaintiff's

7

mental state prior to the 1993 injury. (Tr. at 130.) Dr. Purisch, a specialist in neuropsychology, first stated that plaintiff did suffer from some disability prior to April 5, 1993, and probably had brain damage with cognitive and emotional/personality changes from his 1975 head injury. Dr. Purisch did caution that plaintiff's "self reported history needs to be considered cautiously." (Tr. at 346.) In fact, in a 2005 letter to plaintiff's wife, discussed *infra*, Dr. Purisch stated that his analysis of plaintiff's condition prior to 1993 was based in large part on plaintiff and his wife's subjective accounts. Pl.'s Mot., Ex. 1 at 1-2.

Dr. Purisch considered plaintiff's functional ability both before and after April 5, 1993 in regard to eight work functions. With respect to maintaining work pace appropriate to a given work load, Dr. Purisch stated, "there did not appear to be any disability, or certainly no more than minimal disability, in this work function prior to April 5, 1993." (Tr. at 347.) During that prior time period, plaintiff and his wife both reported to this psychologist that plaintiff worked regularly and had no obvious difficulties with attendance. (Tr. at 130, 347.) "He could complete a normal work day at a consistent pace without excessive rest periods." (Id. at 347.) Dr. Purisch also evaluated plaintiff in other areas of functioning both currently, and for the time period prior to 1993. In regard to comprehending and following instructions, Dr. Purisch found plaintiff "very slightly disabled, likely detectable but not necessarily noticeable prior to April 5, 1993." (Tr. at 346.) Plaintiff was not disabled in his ability to perform simple and repetitive tasks. (Id. at 347.) In regard to performing complex or varied tasks, relating to other people beyond giving and receiving instructions, ability to effectively influence people on a consistent basis, and ability to make evaluations or decisions without immediate supervision, prior to 1993, plaintiff was slightly disabled due to the cognitive effects of his prior traumatic brain injury and alcoholic encephalopathy. (Id. at 347-49.) In regard to ability to accept and carry out responsibility for direction, control and planning, plaintiff was slightly to moderately disabled

\\\\\
\\\\\

prior to April 5, 1993.[5]  (Id. at 349.)

Also covered in the report and referred to by the ALJ are the statements of plaintiff's wife who reported to Dr. Purisch that prior to the 1993 injury, plaintiff's functioning was higher than it is currently.  (Id. at 130, 305.)  Plaintiff and Mrs. Zell had their own business installing cable for computer systems and he had an astonishing ability to determine the spatial configuration for all the cables.  (Id. at 306.)  Before 1993, plaintiff had a very quick mind and was witty, according to his wife.  She stated that he could explain himself well and give directions to others, could pay attention to detail and complete jobs in a precise manner.  (Id.)  Mr. Zell himself told Dr. Purisch that he disagreed with the characterization of him as vocationally disabled and thinks that without his criminal history, he would still have been able to work as a police detective prior to 1993.  (Tr. at 321.)

Finally, Dr. Purisch noted that "credibility clearly is an issue with Mr. Zell," explaining that Zell only told the psychologist about his incarcerations after these facts came out at his deposition.  (Id. at 342.)  Dr. Purisch stated, "[a]t this point, it appears as if he informed me of his ongoing disability related to the 1975 injury only after determining that his denial of difficulties could potentially reflect poorly on his case against the Social Security Administration to reinstate benefits."  (Id.)

There is almost no other medical evidence in the record for the time period at issue due to the passage of time.  Although Dr. Russell stated that he followed plaintiff in 1976 and 1979 for "? neurological disorder," plaintiff's chart had not been saved.  (Tr. at 92.)  This note was written in 1996, some twenty years after the medical treatment, and is the only such evidence from the time period at issue.  In regard to the request to reopen, Dr. Purisch's report establishes that plaintiff had the mental capacity to timely request review of the adverse

---

[5] The degrees of disability described in this report are used in conjunction with a worker's compensation case, and do not equate to disability as used in the Social Security Act.  See Discusion Section B infra.

9

administrative decision, and the court finds no constitutional violation which would require review by this court.

B.  <u>The ALJ Properly Developed the Record by Considering An Independent Retrospective Opinion in Accordance With This Court's Findings and Recommendations</u>

Plaintiff claims that the ALJ failed to obtain an independent medical evaluation in accordance with this court's previous findings and recommendations.  Apparently, Dr. Purisch wrote his 53 page opinion in response to a worker's compensation inquiry, and plaintiff contends that it was not retrospective but was for the purpose of determining apportionment between the 1975 and the 1993 injuries for the worker's compensation carrier.  Nevertheless, there is no reason why the ALJ's use of it as the required retrospective additional evidence was not proper.  In fact, Dr. Purisch's intent was totally neutral in regard to the instant action due to his separate and independent purpose of apportionment, which was not done at the request of either party in this case.  The fact that the report was intended to determine apportionment actually works to this court's advantage as it separates the time periods at issue so that determination of disability prior to 1980 can be more readily analyzed.

Plaintiff also objects to this report because Dr. Purisch, in finding plaintiff minimally disabled prior to 1993, nevertheless found him disabled.  Defendant correctly points out, however, that the terms of art for worker's compensation determinations are based on degrees of impairment so that slight means a 10% impairment, and slight to moderate means a 20% impairment.  Use of the term "disability" connotes more accurately an impairment and does not mean that a person is disabled within the meaning of the Social Security Act.  Def.'s Oppo. at 10-11, n. 5.

After the ALJ issued his findings based in part on this report, plaintiff's wife wrote a letter to Dr. Purisch to which he responded on September 29, 2005.  Pl.'s Mot., Ex. 1.  He stated that his December 13, 2001 report, to the extent it addressed plaintiff's condition prior to April 5, 1993, was based on plaintiff's own account of this time period wherein he represented

his function prior to April, 1993 to be much higher "than is now being contended." Id. at 1. Dr. Purisch emphasized that the information should not be considered factual but based on plaintiff's subjective account. In contrast, the account given to Dr. Purisch by plaintiff's wife described someone who was more moderately impaired as she rated plaintiff's functioning as a 5 on a 0-10 scale prior to April, 1993. Dr. Purisch noted that Mrs. Zell's description of plaintiff during this time period contradicts plaintiff's own description of his functioning during this time. Id. at 2. Consequently, Dr. Purisch recommended examining more objective sources for this time period. Those sources have already been summarized in this court's previous findings and recommendations and are repeated here:

> Plaintiff provided a note from Wm. Scott Russell, Jr., M.D., a neurologist who verified that he treated plaintiff from 1976-1979 for "? neurologic disorder." (Tr. at 92.) Dr. Russell provided no further information, noting plaintiff's chart might not have been saved due to the 20 year inactive period. (Id.) Plaintiff also provided a 1978 denial of liability subsequent to September 22, 1976 from the Colorado State Compensation Insurance Fund, (Tr. at 90), and an Admission of Liability from the State of Colorado Department of Labor and Employment for an accident dated November 19, 1975, (Tr. at 91). He also provided records from clinical psychologist Scott Kaplan, Psy.D. who had tested plaintiff on April 13, 1994, conducting a general intellectual evaluation and an abbreviated neuropsychological screening. (Tr. at 83-85) Plaintiff had been rear-ended in an automobile accident on April 5, 1993. (Tr. at 83.) Plaintiff denied psychological symptomatology prior to the accident. Dr. Kaplan noted that, as of April 13, 1994, plaintiff was experiencing symptomatology, including confusion, memory problems, and other cognitive deficits, which appeared to be consistent with Organic Brain Syndrome. (Id.) Plaintiff's psychological symptoms included depression, irritability, anxiety and anger. (Id.) Dr. Kaplan diagnosed Adjustment Disorder with Mixed Emotional Features. (Id.) Dr. Kaplan reported plaintiff's brain history injury to be negative prior to the 1993 accident. (Id.) Dr. Kaplan thought plaintiff should be retested within a year, "due to the fact that most brain injuries take approximately 2 years for full recovery of function." (Tr. at 85.) In a letter dated October 15, 1996, neurologist Gary M. Weiss, M.D., P.A., indicated plaintiff then was under his care for closed head injury with cognitive deficits. Dr. Weiss noted plaintiff had difficulty with short term memory, constant sharp pain in the temples and frequent headaches. (Tr. at 87.) Dr. Weiss felt plaintiff was permanently, totally disabled. (Id.) A letter from plaintiff's wife, dated July 24, 1996, also was in the file. (Tr. at 80-81.) Plaintiff's wife met him

11

> in 1984, approximately six years after his 1975 disability benefits had been terminated. She believes plaintiff was disabled as of an initial injury in 1975 in Aspen, Colorado, and that things had never changed. (Tr. at 81.) Finally, plaintiff supplied an October 25, 1996 letter from Larry L. Murphy, President of Trail Lincoln Mercury. (Tr. at 95) Mr. Murphy gave plaintiff a job at Deel Ford in 1983. He stated that "Danny Zell of 1983 was not the same person as when I knew him to be Officer Daniel Zell, and our head security person for six years [from 1967-1973] while he was employed by Deel Ford in Coral Gables, Florida, as the head security person at night and as a Miami Police Officer during the day. (Id.) Mr. Murphy observed plaintiff having a hard time keeping up and relying heavily on others for help. (Id.) They mutually agreed to part company following plaintiff's apology for "not being able to function and handle the job adequately." (Id.)

Findings and Recommendations, at 6-7.

Dr. Purisch's September, 2005 letter does not add to or change the evidence already before the court. Therefore, it is not material. Of all the aforementioned evidence before the court, there is just not enough for plaintiff to meet his burden that he was disabled prior to his DLI of December 31, 1980. Plaintiff had to prove he was disabled on or before that date. See, e.g., Flaten v. Secretary of HHS, 44 F.3d 1453, 1461 (9th Cir. 1995). This court acknowledges that plaintiff's burden is especially difficult given the passage of time. Nevertheless, Dr. Purisch's report is especially thorough. Even though the report indicates some level of impairment prior to 1980 as a result of the 1975 accident, it is not at all clear that plaintiff could not do any work during that time period and was disabled. It is true that plaintiff actually received disability benefits from 1976 to 1978; however, this court cannot rely on that fact to now find plaintiff disabled during that remote time period because the medical evidence for that period is just insufficient.[6]

---

[6] While we know that plaintiff's disability benefits were terminated in the late 70's for procedural reasons, we still do not know with any certainty what medically changed in plaintiff's medical condition from a disability in 1975 to a non-disability at or about 1980. However, plaintiff has only himself to blame as any such substantive redetermination was stopped in its tracks by his unreasonable assertion that an EEG, a rather common and fairly painless procedure, would hurt too much. It is apparent that the Social Security Administration was becoming suspicious about any continuing disability – hence the reason for the EEG tests. It is common for

<tbody>
<tr><td>

<tbody></tbody></td></tr></tbody>

The ALJ properly developed the record on remand, and his decision that plaintiff was not disabled prior to his date last insured is supported by substantial evidence.

CONCLUSION

The order to show cause, issued January 25, 2008, is discharged.

Accordingly, IT IS HEREBY RECOMMENDED that plaintiff's motion for summary judgment be denied, the Commissioner's cross-motion for summary judgment be granted, and the Clerk of Court be directed to enter judgment for the Commissioner.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within ten (10) days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within ten (10) days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: 07/31/08

/s/ Gregory G. Hollows

GREGORY G. HOLLOWS
U.S. MAGISTRATE JUDGE

GGH/076
Zell0221.fr.wpd

---

Social Security recipients to undergo a redetermination (continuing eligibility review) when it appears likely that the former disabling medical condition has changed for the better.  The evidence produced in this case predominates in favor of finding such improvement.